# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2318 | **DATE** | 5/19/2000 |
| **CASE TITLE** | Mega Manufacturing, Inc. vs. Haco-Atlantic, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation regarding Plaintiff's Motion for Preliminary Injunction is hereby submitted to Judge Bucklo. The Court recommends that Plaintiff's Motion for Preliminary Injunction be denied. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge. AK

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | 2 | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 2 2 2000 | |
| | Notified counsel by telephone. | | date docketed | 30 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 5/19/2000 | |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | |
| | FT/ courtroom deputy's initials | | VKD mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MEGA MANUFACTURING, INC.,
a Kansas Corporation,

    Plaintiff,

        v.

HACO-ATLANTIC, INC.,
a Texas Corporation,

    Defendant.

No. 00 C 2318

Judge Elaine E. Bucklo

Magistrate Judge
Arlander Keys

DOCKETED

MAY 22 2000

TO:  THE HONORABLE ELAINE E. BUCKLO
     UNITED STATES DISTRICT COURT JUDGE

## REPORT AND RECOMMENDATION

Before the Court is Plaintiff's Motion for Preliminary Injunction. For the reasons set forth below, this Court recommends that the Motion for Preliminary Injunction be denied.

## PROCEDURAL HISTORY

Plaintiff Mega Manufacturing Inc. ("Mega") filed the underlying Complaint against Defendant Haco-Atlantic, Inc. ("Haco") on April 14, 2000, alleging trade dress infringement and unfair competition under §43(a) of the Lanham Act, 15 U.S.C. §1125(a), as well as the statutes and common law of the State of Illinois. (Compl. at ¶1.) On April 24, 2000, Mega filed a motion for entry of a temporary restraining order ("TRO"), which District Judge

Elaine E. Bucklo granted the next day. On April 28, 2000, Mega moved for a preliminary injunction. That motion was referred to this Court on the same date. On May 4, 2000, this Court held an evidentiary hearing on Mega's Motion for Preliminary Injunction. The Court makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

Mega has been manufacturing metalworking equipment since 1973, when Robert D. Brown, Jr., its longtime President and CEO, incorporated the company. (Tr. at 5, 16.) Among its other metal equipment related ventures (such as manufacturing metal components, equipment, tanks, and tiller blades), Mega manufactures ironworkers.[1] (Tr. at 5-6.)

Ironworkers are "high flexibility, relatively small machines[s], that typically ha[ve] between five and six functions." (Tr. at 11, 170.) Those functions include punching, shearing, coping, and notching metal of different shapes. (Tr. at 11, 170.) Coping involves removing a corner from a piece of angle, while notching involves cutting a small piece out of the metal. (Tr. at 109, 171.)

---

[1] Ironworkers make up about twenty-five percent of Mega's total sales. (Tr. at 7.)

2

The first ironworker model that Mega offered was a forty-seven ton punch. (Tr. at 10, 16.) Mr. Brown's business partner was a fisherman and came up with "Piranha" as a "code name for the design project." (Tr. at 10, 11, 50, 51.) The name "Piranha" and the shape of the machine were not clearly conceived of together as a concept. Mr. Brown somewhat vaguely alluded to the fact that his business partner was aware of the powerful jaws of that particular fish, however his testimony also indicated that the project's code name -- Piranha -- just "kind of stuck" and was slapped on the machine when it was first sold. (Tr. at 11.) Specifically, he testified that his partner "dubbed it 'Piranha' and then it kind of stuck, and then we just put it on the machine when we started selling it." (Tr. at 11.)

One of Mega's initial ironworker design criteria was to "keep it a low profile, as small a low profile as we could, to maintain the visibility in small[er] shop[s]. . . . from a safety standpoint, it's better if you can see around or over the machine." (Tr. at 52.) The Piranha P3, as it was known then, is now known as the Piranha P50 ("the P50"). (Tr. at 15.) Mega has sold approximately 6,000 P50's since 1974. (Tr. at 127.) Any patents previously held on the P50 have already expired. (Tr. at 45-46.) No trade dress was ever registered. (Tr. at 46.)

3

Mr. Brown could not really remember any advertising references made to the "fish-like look" of the P50. (Tr. at 54,60.) The advertising campaigns never actually made reference to the "fish-like appearance of the machines." (Tr. at 62.) However, Mr. Brown did somewhat disdainfully mention "a hokey little deal" with "a little caricature of a punch with a fish tail on it" done in the 1970's. (Tr. at 60-61.) He also remembered another "weird looking fish with different colors [that] looked mechanical. . . . it was another caricature. . . ." (Tr. at 61.) Apparently, there were key chains made with this caricatured fish on them. (Tr. at 61.) It is unclear when this advertising was done. There was no evidence presented that people outside of Mega's employ or offices refer to the P50 as fish-shaped. (Tr. at 73, 186.)

Since November of 1999, Piranha machines have had a fish logo (a depiction of an actual fish with sharp teeth) on them in addition to the brand name "Piranha", to serve as an additional identifier. (Tr. at 54, 55.) The Piranha machines also display American flag logos to promote the fact that they are made in the United States. (Tr. at 55-57.)

After introducing the P50, Mega eventually expanded its ironworker line to include machines with greater punch capacity, for example a 120 ton punch. (Tr. at 12.) There are now fourteen

current Piranha ironworker models. (Tr. at 15.) Additionally, there are products today bearing the Piranha name that do not resemble the P50, such as a press brake and shearer. (Tr. at 13, 51, 52.)

Although Mega originally argued that the P50 has a "unique" "distinctive" light green color (Mem. Supp. Mot. TRO at 3-8), the color of the P50 actually "varies." (Tr. at 46.) Initially, it was a darker green, (Pl.'s Ex. 1), though generally it has "always been a light blue green." (Tr. at 47.) In the most recent photographs taken, from approximately two weeks ago, the Piranha machines appear turquoise in color. (Def.'s Ex. AA; Tr. at 48.)

Ironworker customers of Mega's span a "fairly large spectrum. . . from a one-man welding shop . . . to General Motors or the U.S. Navy." (Tr. at 19.) Mr. Brown testified that Mega's "average" customer has under twenty employees. (Tr. at 20.) In order to reach customers, Mega has several methods.

Mega uses telemarketing to pinpoint potential customers, then follows up with literature and video presentations to about ten percent of those potential customers. (Tr. at 20.) Next, the dealers and representatives are notified. (Tr. at 20.) Representatives are Mega employees who work in specific geographic regions with the dealers who actually make the transactions with

the end user. (Tr. at 21.) The representatives go out and do demonstrations for potential customers. (Tr. at 70.)

Trade shows provide another venue for identifying prospective customers. (Tr. at 23.) There are between fifteen and twenty trade shows per year that Mega participates in. (Tr. at 23.) Additionally, Mega spends over a million dollars per year in advertising and promotions.

Mega has at least ten competitors, in the United States and overseas, who make ironworkers. (Tr. at 16, 26.) Mega's primary competitors are Scotchman Industries ("Scotchman") and Geka. Kingsland and Mubea, which are owned by Defendant Haco, are other competitors, as are Edwards and Uni-Hydro. (Tr. at 26-27.) Mega's prices for ironworkers are approximately ten percent higher than its competitors' prices. (Tr. at 28.)

Haco is a Belgian company. Haco purchased the Kingsland company about ten years ago because of its strong name recognition in the ironworker industry.[2] (Tr. at 141.) Haco makes ironworkers under the Kingsland name. (Tr. at 142.) Haco's colors for its Kingsland product line were previously cream with blue, but now

---

[2]In addition to owning Kingsland, Haco also owns Mubea. Mubea was the first to make a hydraulic ironworker. (Tr. at 186.) Harold "Joe" Pinney, is Mubea's exclusive U.S. distributor. (Tr. at 169, 170.)

they are cream with light gray (and yellow on the hold downs for safety). (Tr. at 142, 146, 149, 150, 188; Def.'s Ex. ZZ; Def.'s Ex. AAA.) Haco makes it clear that its Kingsland ironworkers are made overseas. (Tr. at 160.) Kingsland's products do not display American flags on their machines.[3] (Tr. at 57-58.)

One of the new Kingsland ironworkers is called the Shark. Despite Mega's earlier arguments in favor of the TRO that "[b]oth are light green," the Shark and P50 are <u>not</u> the same color. (Mem. Supp. Mot. TRO at 2.) The Shark has never been a green color -- in fact, there is only one prototype, which is cream and grey with yellow accents. (Tr. at 151, 152, 189.) The parties agree that the Shark is cream with a grey center and yellow trim. (Def.'s Ex. LL; Tr. at 103-104.)

In the April 6, 2000 issue of Equip-Mart, the Shark was introduced. (Pl.'s Ex. 3.) The color advertisement ("the Ad") introducing this product had the Kingsland name in large letters running across the top. (Pl.'s Ex. 3.) Below that were the words "Crossing The Atlantic. . . ." (Pl.'s Ex. 3.) Below that the Ad stated "The NEW SHARK Ironworker", with the product pictured inside

---

[3]That is one reason that customers have preferred the Piranha P50 to Kingsland's Shark -- some customers like products made in America. (Tr. at 161.)

the jaws of a shark. (Pl.'s Ex. 3.) The machine in the picture appears to have a greenish hue. (Tr. at 152.) The "introductory" price was listed as "9,900," and at the bottom of the page, was the Haco logo, along with multiple Haco email addresses and sales office locations. (Pl.'s Ex. 3.)

Many products in this industry are very similar in appearance.[4] (Tr. at 163, 179.) Unprotected ironworking machines are often copied in the industry. (Tr. at 185.) It is uncontested that the Shark is quite similar to the Piranha P50. (Tr. at 165; 215).[5] Haco wanted its Kingsland Shark to be very similar in order to compete with the Piranha P50. (Tr. at 189.) There are other ironworkers in the market that are also fish-shaped due to their sloping, tapered upper beams and "biting" profile. (Tr. at 179-80; Def.'s Exs. M, Q, X.)

Piranha machines and Kingsland (Haco) machines are not sold by the same dealers or sold side by side. (Tr. at 83, 194.) Sometimes they are not even sold in the same geographic territory.

---

[4]For example, one of Piranha's press brakes (Def.'s Ex. FF) has the same silhouette as a competitor's press brake. (Def.'s Ex. G.)

[5]The main differences are: the color; the straight lines on the upper beam profile instead of one smooth curve; the lifting lug on top; the Kingsland logo; the stop button; and the cabinet shape with the motor in it. (Tr. at 41-42, 75, 89.)

(Tr. at 73.) However, even if the two were sold together, customers do not buy ironworkers on impulse or whim or from far away; rather, they inspect close up. (Tr. at 88, 159.) Ironworkers are very expensive products: the P50 is sold at $13,500 (Tr. at 83), while the Shark's introductory price is just under $10,000.

Moreover, ironworker purchasers are not interested in the appearance of the machine, instead, they are focused on the specifications of the particular machine before they purchase it.[6] (Tr. at 158, 176-179.) These specifications include the machine's punching, shearing, and notching capacities. (Tr. at 158, 174.) Sometimes customers will even ask one manufacturer to compare its machine with the features of another competitor's machine. (Tr. at 159.) For bigger companies, this is done by using spread sheets for each machine's specifications. (Tr. at 159.) It is common in the industry for manufacturers to put their brand name on their machines in order to identify themselves; therefore, potential purchasers can easily find the source of the product by looking at the name on the machine. (Tr. at 86, 190-191.)

---

[6]Some ironworkers perform more functions than the P50, such as cutting structural shapes like Z's, C's, T's, I's, and angling iron. (Tr. at 30, 33, 94.)

Small shop customers make up at least twenty-five percent of ironworker purchasers (although one Piranha distributor, James Hendley, of Gulf State Saw & Machine Company in Alabama, put his "small mom-and-pop shops" -- meaning two to four people shops -- customers at fifty percent (Tr. at 69-71),[7] the Court gives slightly more credence to the testimony of Joe Pinney, the exclusive U.S. distributor of Mubea ironworkers, since he speaks from a nationwide perspective regarding the customs and practices of ironworker purchasers, rather than a merely regional one). (Tr. at 172-74, 197.) Additionally, the Court finds the phrase "mom-and-pop" to be somewhat of a misnomer; "start-up" companies or "smaller" companies is more appropriate. (Tr. at 198.) The start-up companies, before they make a large capital investment in an ironworker, investigate the product and learn everything they can about it, especially since it may be one of the "biggest purchase[s]" they have made. (Tr. at 198.) It is a big purchase, not only because of the high price, but because high quality ironworkers can last for twenty years. (Tr. at 196, 197.)

The dispute in the matter at bar arose when Mega first learned

---

[7]The Court notes that Kingsland is not even a competitor in Mr. Hendley's territory -- his competitors are Scotchman primarily, and then Geka. (Tr. at 73.)

of Haco's Shark, sometime around April 10, 2000 -- when Mr. Brown was given a faxed copy of the Ad. (Tr. at 35; Pl.'s Ex. 3.) He immediately called Mega's VP of sales and marketing into his office, and said "[w]e need to come up with a strategy on how we are going to communicate to our reps and dealers about this product and how we are going to sell against it." (Tr. at 36.)(emphasis added). He then checked his phone messages and listened to a message from Jerry Kroetch, the president of Mega's chief competitor Scotchman, which said "[y]ou must have really pissed those guys off over there in Belgium. . . ." (Tr. at 36-37.) Mr. Kroetch's message indicated that he knew the Ad was for a copy of the Piranha P50. (Tr. at 37.) Mr. Brown knew, when he saw the Ad, that the Shark was manufactured by Kingsland. (Tr. at 66, 67.) Similarly, when Mr. Hendley got a call from someone at Mega who said "[o]ur worst fears have come to light," he immediately responded "[k]nock-off of P50." (Tr. at 87.) That was the first time Mr. Hendley learned of the Shark. (Tr. at 87.) It was clear, from the Ad, to the aforementioned people, that the product "came from overseas." (Tr. at 58, 88, 157.)

The next day Mr. Brown and Mr. Kroetch discussed the fact that the Shark was a copy of the P50 and that they "didn't need another competitor." (Tr. at 38, 66.) Mr. Brown believes that the Shark

"will affect [Mega's] sales. . . . [because this happens] anytime you enter another product in the market, and especially since it has such a general appearance of our product. . . ." (Tr. at 43.) The lower price of the Shark ($9,990 versus the $13,500 of the P50) was a concern of Mr. Brown's. (Tr. at 62-63, 83.)

Mega has not submitted any evidence of actual customer confusion. The Court gives little, if any, weight to the affidavits submitted by Bud Hinkens, Danny Brown, and Jamison Koele. (Mem. Supp. Pl.'s Mot. Prelim. Inj. at Exs. C, D, E.) Although Mr. Hinkens purchased an ironworker from Mega in 1975, he is not a current customer or buyer and his declaration does not relate to any current experience he had in looking to buy an ironworker. Mr. Brown is not even a former customer, rather he is president of a company that manufactures products and tooling for ironworkers. Similarly, Mr. Koele is not a customer, instead he is a Piranha ironworker dealer.

In the instant motion, Mega seeks to enjoin Haco from displaying, promoting, and selling the Shark.

## CONCLUSIONS OF LAW

On a motion for a preliminary injunction, the plaintiff must demonstrate that (1) there is some likelihood of success on the merits, (2) no adequate remedy at law, and that (3) the plaintiff

12

will suffer irreparable harm if the injunction is not granted. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir. 1997).[8]

The chances of success on the merits at the preliminary injunction stage only need to be "better than negligible." *Meridian*, 128 F.3d at 1114-15. The more likely the plaintiff's chances of success on the merits, the weightier his side of the scale in the balancing test. *Boucher v. School Bd. of the Sch. Dist. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998).

In a trade dress/product configuration[9] infringement case, to prove likelihood of success on the merits, the plaintiff must show that:

> (1) its trade dress has either acquired secondary meaning or is inherently distinctive and (2) that the similarity of the defendant's trade dress to that of the plaintiff causes a likelihood of consumer confusion as to the source or affiliation of the products.

---

[8]Upon clearing this threshold, the Court must then (1) balance the harm to the plaintiff if the injunction is not granted against the harm to the defendant if the injunction is granted, and (2) after weighing the interests of the parties, considering the public interest in granting or denying the injunction. *Meridian*, 128 F.3d at 1114-15.

[9]Trade dress means "the total image of a product" and includes size, shape, color(s), texture, graphics, and particular sales techniques. *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 636 (7th Cir. 1999)(internal quotations omitted).

*Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 94 F.3d 376, 380 (7th Cir. 1996). Moreover, even if the plaintiff meets its burden on these two issues "it cannot prevail if the defendant demonstrates that the plaintiff's trade dress is functional." *Id.*

## I. Secondary Meaning

Secondary meaning is established when "in the minds of the public", the "primary significance" of the trade dress or product configuration "is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.* 120 S.Ct. 1339, 1343 (2000). Furthermore, it is "almost invariabl[e that] even the most unusual of product designs . . . . is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 1344.

There was no evidence submitted that people outside of the Mega enterprise even refer to "the fish-shape" of the P50, or associate it with Piranha or Mega, much less that the <u>primary</u> significance of the trade dress and design configuration are to identify the source of the P50. Additionally, there has been very little done by Mega to emphasize "the fish-shape" of the P50 ironworker: as Mr. Brown testified, there have only been two marketing gimmicks utilizing fish in the past twenty-five years.

14

Moreover, it is not even clear from Mr. Brown's testimony that there was any original intent that the Piranha name and the shape of the P50 correspond. Nor did Mega ever seek to patent or copyright the design configuration and/or trade dress of the P50. Further, the Piranha name is not limited to the P50 -- in fact, there are other products in the Piranha line that could not be described as resembling a fish at all. Finally, the shape is not as unique as Mega claims; there are other ironworkers, marketed by different companies, which resemble the sloping planes and "biting" look of the P50.

Thus, the Court concludes that Mega has failed to establish secondary meaning for the P50's trade dress/product configuration.

## II. Likelihood of Consumer Confusion as to Source

Assuming, *arguendo*, that secondary meaning has been established, the Court will address the other required component: likelihood of confusion.

The Seventh Circuit has traditionally used seven factors to evaluate whether there is a likelihood of confusion in a trademark infringement or trade dress case: (1) the similarity of the trade dresses; (2) the products to which the trade dresses are attached; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the

15

plaintiff's trade dress; (6) actual confusion; and (7) the intent of the defendant to pass off its products as those of the plaintiff. *Dorr-Oliver*, 94 F.3d at 381. The weight to be accorded to each factor varies from case to case. *Id*. Additionally, the Court "must compare the trade dresses 'in light of what happens in the marketplace, not merely by looking at the two [products]. . . side-by-side.'" *Syndicate*, 192 F.3d at 636 (quoting *Meridian*, 128 F.3d at 1115). Thus, the likelihood of confusion "must be determined with reference to the realities of consumer behavior in the relevant market." *Dorr-Oliver*, 94 F.3d at 381-82, 384.

Many of the seven factors are inappropriate, or do not even function in the same way, "with respect to trade dress inhering in a product configuration." *Versa Prods. Co., Inc. v. Bifold Co. Ltd.*, 50 F.3d 189, 202 (3d Cir. 1995). In a product configuration trade dress infringement case, "the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging, and advertisements." *Syndicate*, 192 F.3d at 637 (quoting *Versa*, 50 F.3d at 203). More specifically, where the manufacturer's name is prominently displayed on the product, there is generally no likelihood of confusion found. *Id.; Dorr-Oliver*, 94 F.3d at 383.

*Dorr-Oliver* involved starch washers used in processing corn to remove the starch from the protein. 94 F.3d at 378. The plaintiff developed and introduced "the clamshell" shaped starch washer in the 1950's. *Id.* The plaintiff's name is cast into the clamshell's outer housing, and the product also displays a nameplate and trademark. *Id.* Clamshell starch washers need only be purchased once because their steel outer housings last indefinitely. *Id.* Even after its patents on the clamshell had expired, the plaintiff remained the sole producer and supplier of the clamshell for many years. *Id.* Its clamshells sold for about $40,000 each. *Id.* The defendant first began selling replacement parts for the clamshells, then, after receiving requests from several of the plaintiff's clamshell customers, it began producing nearly identical clamshells and selling them for approximately $20,000 each (half the price charged by the plaintiff). *Id.* The defendant's clamshells have its name cast into the outer housing as well as on an attached nameplate. *Id.* The plaintiff sued the defendant, asserting that, under the Lanham Act and state law, it had exclusive rights in the design of the clamshell's outer housing (i.e. the product's configuration *qua* trade dress) and in the use of the word "clamshell" in connection with starch washers. 94 F.3d at 379.

17

The *Dorr-Oliver* Court found that the defendant "held itself out to [the relevant market] as a competitor of [the plaintiff], and conspicuously marked its clamshells with its company name." *Id.* at 381. It was clear that clamshell purchasers would know from whom they were buying. *Id.* Consumers in the market for clamshells were not likely to be confused by the fact that there were two competing products. *Id.* at 382-83. Particularly in "the context of this industrial machine, the typical consumer will not assume that the two manufacturers are associated in some way. Rather, where product configurations are at issue, consumers are generally more likely to think that a competitor has entered the market with a similar product." *Id.* at 383 (emphasis added). Further, there was no evidence that the defendant lured or attempted to lure customers from the plaintiff by passing-off its clamshells as that of the plaintiff. *Id.*

In the case of product configuration, it is fair for a competitor to enter the market on the back of the design originator. *Id.* at 383. "'[E]xploiting the goodwill of the article – the attractive features, of whatever nature, that the product holds for consumers – is robust competition; only deceiving consumers or exploiting the goodwill of another producer is unfair

18

competition." 94 F.3d at 393 (quoting *Duraco Prods. v. Joy Plastic Enters. Ltd.*, 40 F.3d 1431, 1445 (3d Cir. 1994)). Although a competitor may not copy a product feature that serves as a source identifier, it may "'slavishly copy the design of a successful product.'" *Id.* (quoting *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658 (7th Cir. 1995)). With regards to product configuration cases (which requires delicate balancing of trademark and patent laws), courts generally find that "in the case of a high priced, single purchase product, there is generally no likelihood of confusion when the manufacturer's name is clearly displayed on the product." *Id.* at 383. In *Dorr-Oliver*, there was no plausible theory of consumer confusion, let alone one supported by evidence, therefore the plaintiff's claim failed.

Here, the Court is confronted with facts very similar to those in *Dorr-Oliver*. It is undisputed that the industrial products at issue are similar and have very similar configurations, albeit with differing colors and prominently displayed manufacturer's labels. It is also uncontested that the P50 and the Shark are used for similar purposes by similar people: the Shark was designed to compete with the P50. The degree of care likely to be exercised by consumers of ironworkers is great.

In assessing the degree of care exercised by consumers in selecting a product to purchase, the Court considers the expense of the product, and the sophistication of the purchasers. *Sam's Wines & Liquors Inc., v. Wal-Mart Stores, Inc.*, No. 92 C 5170, 1993 WL 350194, at *4 (N.D. Ill. Sept. 7, 1993). "[W]hen a product's cost is high, the courts assume that purchasers are likely to be more discriminating than they might otherwise be." *Id.* (internal quotations omitted). Here, the prices are high -- ranging from approximately $10,000 to $13,500. With respect to the sophistication of the consumers, as Mega itself stated "[t]he sophistication of the relevant consumer is likely to be pretty high . . . ." (Mem. Supp. Mot. TRO at 11.) At least fifty, if not seventy-five, percent of the relevant ironworker purchasers are larger companies. Moreover, as to the remaining purchasers, the Court found earlier that the reference to them as being "mom-and-pop" purchasers was somewhat misleading. The other purchasers are start-up companies or smaller operations. Although they may not be as business savvy as some of the larger companies, they are certainly not unsophisticated, and would tend to take large capital investments seriously. Generally, the smaller purchasers investigate the available ironworkers and learn everything they can

about them before buying, especially in light of the price and longevity (twenty years or more) of the product.[10]

The next factor – proof of actual confusion - is entitled to substantial weight. *See International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1090 (7th Cir. 1988). That is because "actual confusion is the best evidence of likelihood of confusion." *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 382 (7th Cir. 1976); *see also International Kennel*, 846 F.2d at 578, n.3. However, like the plaintiffs in *Dorr-Oliver*, Mega has presented no credible evidence of actual customer confusion here.

Finally, similar to the facts in *Dorr-Oliver*, there was no evidence presented that Haco is attempting to lure customers from Mega by passing-off the Shark as Mega's Piranha P50. Mega's "bait and switch" argument was simply unsupported by any evidence.

In summary, at this time, Mega has not presented evidence that

---

[10]*The Northwestern Corp. v. Gabriel Manufacturing Co.*, No. 95 C 2004, 1998 WL 525431, at *4, n.7 (N.D. Ill. Aug. 19, 1998) is distinguishable from the present case. In *Northwestern*, which was before the Court on a motion for summary judgment, the plaintiff had evidence of actual customer confusion. Moreover, the product in that case -- gumball machines -- was not nearly as expensive as the ironworkers in the matter at bar. Finally, in *Northwestern,* "ninety percent of the relevant consuming public is the typical, ordinary person. . . ." not sophisticated consumers.

would support a likelihood of confusion finding.

## III. Functionality

Even if Mega had, *arguendo,* met its burden on the issues of secondary meaning and likelihood of confusion, which it did not, there is still the issue of functionality. Mega cannot prevail if Haco demonstrates that the P50's trade dress is functional. *Dorr-Oliver,* 94 F.3d at 380. Although Haco did not directly point to this fact, Mr. Brown's testimony certainly alluded to it. He testified that one of Mega's P50 design criteria was to keep the machine as small and low-profiled as possible in order to maintain visibility and safety in smaller shops.

Functionality has to do with features that cannot easily be designed around. To be considered "functional" the feature must be "necessary to afford a competitor the means to compete effectively." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.,* 870 F. 2d, 1176, 1188 (7th Cir. 1989). As Mega correctly points out, there are other ironworking machines, built with different configurations, which have or are able to be utilized for the <u>same ironworking techniques</u>. However, Mega is wrong in its assumption that these other machines have all of the <u>same capabilities</u> as the P50. One of the P50's capabilities -- what it was designed for --

was to increase safety and visibility in small shops. As Mr. Brown testified, one of the reason's for the P50's flatter, sloping planed design was because Mega wanted to "keep it . . . as small a low profile as we could, to maintain the visibility in small shop[s]. . . . [since] from a safety standpoint, it's better if you can see around or over the machine."

Thus, it appears to this Court that the planes and low profile of the machine are functional components. Moreover, it is quite possible that, in order to compete effectively with Mega for business with the smaller shops -- Mega's sales representative testified that small shops make up fifty percent of the P50 sales, while Haco's witness testified to only twenty-five percent sales to smaller shops -- it was necessary for Haco to incorporate this superior design feature which would increase visibility and safety (and appeal) to smaller buyers.

### CONCLUSION

"Imitation is the lifeblood of competition." *Thomas & Betts*, 65 F.3d at 657 (quoting *American Safety Table Co., Inc. v. Schreiber*, 269 F.2d 255, 272 (2nd Cir. 1959)). "Copying is not only good, it is a federal right -- a necessary complement to the patent system's grant of limited monopolies." *Id.*

For all of the reasons discussed above, the Court concludes that Plaintiff has not even cleared the first preliminary injunction hurdle. Plaintiff's likelihood of success on the merits is not better than negligible with respect to secondary meaning and likelihood of confusion (or functionality). Therefore, the Court recommends that Plaintiff's Motion for Preliminary Injunction be denied.

DATED: May 19, 2000          RESPECTFULLY SUBMITTED:

_____
ARLANDER KEYS
United States Magistrate Judge

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Elaine E. Bucklo. *See* FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).